MONCURE, P.
It is well settled that a surety is entitled to be relieved from his liability to pay the debt of his principal, either in toto or pro tanto as the case may be, if the creditor, without the consent of the surety, make a new contract with the principal, founded on valuable consideration, to postpone the day for the payment of the debt for a certain period (however short) beyond the day on which it was to be paid by the terms of the contract on which the surety was liable; or i f the creditor, without the consent of the surety, release any lien which he may have on any property of the principal for the security of the debt. The extent of the relief to which the surety is entitled in the former case being in toto, without regard to the extent of damage actually sustained by the surety by reason of such new contract, or whether any such damage was sustained at all or not; and in the latter case being in toto or pro tanto, according as the value of the property released was as much as or less than the amount of the debt.
The principle on which rests the right of the surety to relief as aforesaid is, that his rights cannot without his consent be impaired by the act of the creditor; *that he has a right, at any time while he is surety, to pay the debt, or by a bill quia timet to compel the principal to pay it; and to be subrogated to the place of the creditor in regard to any liens the latter may have on any property of the principal for the security of the debt.
The appellant, Shannon, who was the surety of Thomas and Williams in a forthcoming bond on which judgment was recovered in the County court of Smyth, and on which judgment an execution was issued and levied on the property of the principal debtor Thomas, and was more than nine years thereafter renewed, obtained an injunction to the said renewed execution, so far as he was concerned, on a bill filed by him in the Circuit court of said county, in which he complained that the appellee, McMullin, who was the only defendant to the bill, for whose benefit the said execution was endorsed, and who was entitled to the use of the same, had directed the sheriff, who had levied the said execution, to hold it up, and not to sell the property levied on; that the said execution was accordingly held up, and the said property not sold, by direction of said McMullin without the authority or consent of the complainant. In the language of the bill: ‘ ‘Nine years have elapsed; the affairs of said Thomas have become extremely embarrassed, and nothing can be made upon execution against him. His property levied upon is all gone, or put beyond the reach of execution by emancipation, sale, wear and tear, and deeds of trust, &c. He has held and disposed of since said levy large amounts of property ; has handled and paid large sums of money, and has carried on a very large business.” And the complainant claimed to be discharged from liability as surety on said judgment and execution by the interference of *said McMullin. He further charged, that by the direction of said McMul-lin, a new execution had, on the 18th day of August, 1869, been issued on the said judgment, was then in the hands of the sheriff of said county, and that complainant had reason to know that the sheriff would proceed to levy the same upon the property of complainant unless restrained by injunction. He also claimed that other credits, which are enumerated in the bill, in addition to a credit of $500, endorsed on said *362 execution, were property applicable thereto. And he prayed that McMullin might be made defendant to the bill, and be enjoined from all further proceedings on said execution against the complainant or his property ; that the complainant ' might be discharged from all liability as surety in said forthcoming bond and upon the judgment and execution thereon, and for general relief.
Among the exhibits filed with the bill was a copy of the original execution on the forthcoming bond and of the endorsements thereon. The execution bore date on the 23d day of June, 1860, and was returnable to the next August court of said county, being the Tuesday after the third Monday in that month. Among the endorsements ■on the execution the following appear, and in the following order:
“Levied on the following property, together with other executions, to wit: one negro man George, Ered, Campbell, Stephen and David; one woman Ellen and Polly; one boy James, Hiram and King; one girl Mary, Deemy and Ann; 10 horses, 6 wagons, one carriage, one buggy, 30 head of cattle, one steam saw mill and fixtures, one reaper and thresher, Aug-ust 20th, 1860.
V. S. Morgan.”
215 ^“Received of V. S. Morgan on the within execution five hundred dollars.
E. McMullin.
Jan’y 22nd, 1862.”
“The above payment of 1500, Jan’y 22nd, 1862, was paid by J. H. Gilmore for A. Thomas, being all that Thomas has paid on this execution.
V. S. M.”
“This execution held up and property not sold, by direction of E. McMullin.
V. S. Morgan, S. S. C.”
It thus appears that the appellant claims no relief upon the ground of any new con-fract made by the creditor with the principal debtors whereby the creditor’s right to enforce the payment of the debt by the principal was suspended for a single instant; but he claims relief only upon the ground that by the levy of the execution, the creditor acquired a specific lien on property of the principals sufficient in value for the payment of the debt, and that this lien was, in effect, released by the creditor without the consent of the surety.
The ground r.elied on by the surety for his discharge from liability for the debt is amply sufficient for the purpose if it be sustained by the facts, and the only question is: Do the facts of the case sustain it?
Without stopping to inquire whether the facts as set out in the bill are sufficient to sustain the ground relied on for the discharge of the surety, I will proceed to inquire whether, upon the whole case, ne is entitled to such discharge. We have seen what is stated in the bill; let us now take a brief view of the answer and the proofs.
The creditor, the appellee McMullin, in his answer, *admits that the execution was endorsed for his benefit on the 3d of July 1860, by James H. Gilmore, for whose use the judgment had been obtained and the execution issued; but, he says, hé had no knowledge of the existence of such an execution until the 25th of August thereafter, when, calling on said Gilmore for the payment of money' due from him to respondent, said Gilmore, to meet the just demands of respondent, gave him an order on V. S. Morgan, the sheriff of .Smyth county, for the amount of said execution ; which order is filed with the answer as part thereof. This order, respondent asserts, gave him the first information of said execution, and he says he knew nothing of the endorsement thereon for his benefit until since the filing of the bill. The return day of the execution, as well as the levy of the same, were both prior to the 25th day of August 1860, the date of the order from Gilmore to respondent. The return of “levied,” &c., dated 20th day of August 1860, and signed by the sheriff, was a complete return, and by it- the said sheriff became bound as sheriff to account to respondent for the full amount of said execution. The pretended supplemental or additional return (“This execution held up and property not sold, by direction of E. McMullin,”), being unauthorized by law, is therefore not binding on respondent in any sense. He then proceeds in his answer, emphatically and repeatedly to deny that he gave any such direction to the sheriff, to hold up the execution and not to sell the property, as stated in said pretended supplemental or additional return. He says, in different parts of his answer: “This respondent here now denies that he ever, at any time, gave directions to the sheriff, V. S. Morgan, to hold up the execution and not to sell the property levied on. ’ ’ “So far from *ever having directed the sheriff to hold up said execution, he, some two or three times after the 25th day of August 1860, urged said Major, as sheriff of Smyth county, to pay him the amount of said execution, and informed him repeatedly that he held him responsible as sheriff for the amount of the same, ’ ’ and threatened to move against him and his sureties for the same.” Again, “Your respondent positively denies giving any such instructions as are mentioned in what is styled in complainant’s bill, ‘the addition to said return of levied.’ ” And again, “Respondent denies any interference with the execution on which the sheriff made the levy as aforesaid, except to urge the sheriff to make the same after your respondent became entitled thereto.” He also makes the following averments in his answer: ‘ ‘It is also true that a stay law has prevented the renewal of execution until the date of the execution now enjoined, which issued by reason of non-payment of interest provided by said stay law. This respondent, however, since the 25th cay of August 1860, has several times admonished the complainant, Charles J. Shannon, that the complainant, being bound with Abijah Thomas for the amount of said execution, ought, for his protection, to secure from said *363 Thomas an indemnity against it; and your respondent positively avers that at these instances with complainant he never disputed his liability to your respondent, nor was your respondent ever informed of any claim of discharge from such liability until the tiling of complainant’s bill. ” He then admits that besides the credit of five hundred dollars endorsed on the execution, the defendants therein are entitled to another credit of five hundred dollars and the two years’ interest mentioned in the bill, but denies that he has received anything else on ^account of said execution (or the debt for which it was issued).
Now taking the case upon the bill and answer, together, with the general replication which was filed to the answer, it is very clear that the complainant is not entitled to the relief that he claims. The only allegations of the bill on which the prayer for relief is founded, are expressly, positively and repeatedly denied by the answer. The pretended additional return is not conclusive, nor even prima facie evidence against the respondent. The cases referred to in Crocker on Sheriffs, $ 47, fully sustain this proposition. “Where the process is returnable process,” says that writer, “if the officer make return of the performance of acts beyond his duty under such process, such return will be invalid as to such parts, and will not be evidence, though the addition of such parts will not render the whole return void, but it will be good to the extent he was authorized to make return. Though such return will be invalid as to others, it may be used as an admission against the sheriff in a proper case. Thus the sheriff cannot make his return evidence that he has paid money levied under an execution to the plaintiff, yet such return maybe used against him in an action for not paying over the money. (Cowen and Hill’s notes, 1083.) Nor can the officer’s return be evidence of any fact which would go to excuse him for not having performed his duty, except as has been seen, such facts be official acts done in the ordinary and usual course of proceedings under such process. Thus a return to an action that goods levied on had been casually destroyed by fire after the levy, will not be competent evidence for the sheriff in an action against him for not collecting the moneys on such execution. (S Denio E.
586, Browning v. Harford.) When such *fact is a good defense, as it will be where the sheriff has taken the property into his possession, and it is destroyed by fire, or is otherwise lost, without fault on his part, it must be proved in the usual mode.” In the case under consideration the sheriff seems to have endorsed his return of “levied,” &c., on the execution, while it was in force. It bears date August 20, 1860, and is responsive to the mandate of the writ. When he made what is called his additional return does not appear. It bears no date, and may have been made long after the return day of the writ, and j while the execution creditor was pressing him for the money, and threatening to make him liable for it. It does not appear when he returned the execution to the office from whence it issued. He may have retained it in his hands until the bill in this case was filed. It would be strange if the sheriff could fabricate in his favor such evidence as he pleased, by a mere endorsement on an execution or other paper which might happen to be in his possession at the time. Certainly he cannot do so.
Then let us look at the evidence in the cause and see whether that varies the case, and if so, which way, and to what extent.
Two witnesses were examined in behalf of the complainant Shannon, viz: V. S. Morgan and J. H. Gilmore. The substance of their testimony, so far as material to be stated, is as follows:
V. S. Morgan, in answer to a question of complainant in regard to the original execution, said: “The execution came into my hands as sheriff of Smyth county in July 1860. I levied on some property, together with other executions subject to older levies, and Mr. Thomas was hard run and trying to get indulgence upon his debts, and told me if Governor McMullin *could get a part of the money upon this debt he wouldn’t press for the balance. I then saw Governor McMullin myself on the subject, and he told me that if he could get a thousand dollars I could hold up the execution, as he did not wish to press Thomas; and I paid him five hundred of the thousand dollars of my own money, for which I took his assignment or receipt on a separate piece of paper, I don’t know which, and Mr. James H. Gilmore paid five hundred dollars more for Captain Thomas to me, and I paid it to McMullin; and it was the understanding then between me and McMullin that I was not to press Thomas any further for the money until I was further notified by McMullin. He never gave me any further notice, but spoke frequently in my presence of his indulgence to Thomas on the execution.”
J. H. Gilmore in answer to a question of complainant said: ‘ ‘On the 3d day of March, 1859, I purchased of I). A. Scott a note executed by Abijah Thomas and A. C. Williams to him for twenty-four hundred dollars. It was assigned to me, and suit was brought upon it, and judgment obtained at March court 1860. I see that I endorsed on the fi. fa., on the forthcoming bond in the case, that the execution was for the benefit of Bayette McMullin. The money with which I purchased the note was the money of Eayette McMullin, and this note was purchased by me according to an agreement between him and myself with regard to the purchase of paper, though I cannot say certainly that he knew of the purchase of this note until I gave him an order on the sheriff for the money of date August 25, 1860. I suppose I made the endorsement on the fi. fa. because I knew that the money would be really coming to Governor McMullin. I never gave the sheriff any instructions about the execution. I do not know *364 anything- *about what directions were given him by Governor McMullin.” After making a statement in regard to the two payments of $500 each on account of the execution, not material to be here repeated, he further said: 1 ‘I have an impression that Governor McMullin and some one else, perhaps Mr. Morgan, or perhaps Captain Thomas (I have a very indistinct recollection of the person who came with Governor McMullin,), came to me on one court day, and one of them said that Governor McMullin was willing to give time on this debt against Captain Thomas, or was willing to hold it up, or words to that effect, if I was willing. I replied, that as the debt did not belong to me, I could not take any control of it. Nothing further was said between us that I recollect, and the parties walked away. This conversation must have taken place before the war, as I had no conversation with any one about fi. fa. that has been issued in this case.
Three witnesses were examined in behalf of the defendant McMullin, viz: A. Thomas, one of the principals in the execution, the defendant McMullin himself and J. H. Gilmore, who had been examined in behalf of the plaintiff. The substance of their testimony, so far as material, is as follows:
A. Thomas, in his examination-in-chief, after making a long statement, in answer to a question propounded to him by the defendant, in regard to $1,000, which he said he had sent to the sheriff Morgan to be applied to the payment of the debt due the defendant, but which the said Morgan applied to other claims which he said were in his hands against said Thomas, gave the following answers to the following questions :
Question by defendant. Did I not say if you would pay me $1,000, I would indulge you a reasonable length of time, if J. H. Gilmore was willing?
* Answer. I do not recollect the precise language used by you in regard to the indulgence.
Question by same. Did I, at any time, in your presence, direct Mr. Morgan to hold up the execution?
Answer. I have no recollection of ever hearing you give him any such instructions.
And then, in his cross-examination, besides other testimony not material to be stated, gave the following answers to the following questions
Hirst question by complainant’s counsel. Why was not your property on which was levied said execution, sold to pay it?
Answer. I have no recollection why Morgan did not sell my property to pay said debt.
Question by same. Did you not have plenty of personal property at all times before the beginning of the war in 1861, out of which said debt could have been made?
Answer. I have no doubt but what I had property sufficient to pay off all the executions against me at the commencement of the war, and more than sufficient.
Question by same. Did you or not after the levy of said execution, pay to V. S. Morgan, or his deputies, large sums of money which were applied to the satisfaction of younger executions?
Answer.. I cannot state as to the date of executions on which money was credited I paid to V. S. Morgan, or deputy. I did pay Morgan and his deputies considerable amounts of money after the levying of said execution. I paid a considerable amount that I cannot find where either of them has credited me, which I expected would be applied to debts in their hands.
Question by same. How much have you actually paid on the debt in controversy?
* Answer. I know I directed as much as $1,500 to be paid on said debt, and furnished funds to J. H. Gilmore and É. A. Scott to pay the amount.
E\ McMullin, the defendant, made the following statement in his deposition: “In my answer to complainant’s bill I omitted to state that I did say to W. A. Thomas that if he would send and pay to me $1,000, I would indulge him a reasonable length of time. I went to Mr. J. H. Gilmore, I think with Mr. V. S. Morgan, and stated to him that if he, Thomas, would pay me $1,000 I would indulge him a reasonable length of time, if he, Mr. Gilmore, was willing; to which Mr. Gilmore replied that he would not interfere in the matter. I understood that Mr. Thomas had sent to E. A. Scott $1,000. I then called on Mr. Morgan for the money. He, Morgan, stated to me that he had other executions against said Thomas that must be paid, and he only gave me $500, which he, Morgan, stated, I think, afterwards, was his own money. I had received, prior to this time, $500, and if Mr. Thomas had paid me the $1,000, I would have given him indulgence, provided Mr. Gilmore would have consented; but Gilmore declined to extend the indulgence, and Capt. Thomas and Morgan failing to pay the $1,000, I let the matter rest; and the stay law was enacted so that I could not enforce the collection. I will repeat what I. stated in my answer, that I deny, distinctly and emphatically, that I gave any orders to Mr. V. S. Morgan to hold up the execution and not sell the property. I could not have given the direction, for the reason that I did not get the order from Mr. Gilmore to Mr. Morgan for the money until the 25th August 1860, which was five days after the return of the property as stated in the so-called return of Morgan.”
*J. H. Gilmore’s second deposition seems not to be material.
On the 19th day of March, 1873, the cause came on to be heard upon the bill, answer and replication thereto, depositions, &c., when the court being of opinion that the complainant was entitled to the following credits on the debt in controversy, to wit: $500 of date the 22d December, 1860; $500 of date 22d January, 1862; and $194.80, amount of interest paid the day of , 1867; decreed that the injunction awarded in the case should be dissolved, and that the de *365 fendant be no longer restrained from collecting by execution his debt aforesaid, after endorsing thereon the credits aforesaid, and recover his costs of the complainant. From that decree the complainant obtained this appeal.
The question upon the whole case which is now before us is, whether the appellant has made out his defense, that the execution was held up, and the property levied on was not sold by the sheriff by direction of the appellee, McMullin, the execution creditor, without the authority or consent of the appellant, Shannon, the surety.
The appellant, who has no personal knowledge whatever on the subject, so alleges in his bill. The appellee, who has full personal knowledge on the subject, directly and emphatically denies in his answer the truth of the allegation. That denial is conclusive in favor of the appellee, unless it be overthrown by the evidence of at least two witnesses, or one with pregnant circumstances. Has it been thus overthrown? Is it disproved by the required amount of countervailing evidence?
The only evidence in the case which tends to sustain the allegation of the bill, is the testimony of a man *who was deeply interested in sustaining it, to wit: the sheriff, Morgan, who professes to have made the levy, and who has certainly been guilty of great default, if he held up the execution and failed to sell the property without the direction of the execution creditor. The testimony of such a witness, testifying under such circumstances, can have but little weight. He was testifying not only as to facts in' which he had the deepest interest, but from vague recollection of what must have transpired, .if at all, ten years before he gave his testimony, and without the aid of a scratch of a pen to refresh his memory, unless it be the additional return, so-called, as to the time of endorsing which there is no evidence. We can readily see how easy it would be for such a witness, giving testimony under such circumstances, to imagine that he had been directed by the execution creditor to hold up the execution, and not to sell the property, when the creditor, at most, only refrained from active proceedings to coerce the payment of the debt, either by the debtors or by the sheriff himself on account of his default. It would require strong corroborating circumstances in support of the testimony of such a witness to overthrow the denial of an answer. The positive testimony of a most disinterested and truthful witness, would be insufficient, of itself, to have that effect. There are, in this case, no corroborating circumstances, tending to support the testimony of the sheriff, but the circumstances of the case rather tend to disprove it. If the fact were as he testifies it to have been, why did he not, in so important a matter, procure the written authority of McMullin to hold up the execution and not to sell the property until further orders. One line, signed by McMullin, would have answered the purpose, and *left no room for dispute or controversy. That line might, most appropriately, have been endorsed on the execution. But written anywhere, it would have answered the purpose. It was written nowhere. That it was written nowhere, and that the sheriff preferred to rely for his defense upon his loose recollection of what transpired ten years before his testimony might have to be given, or upon his own unauthorized endorsements, made, nobody knows when, upon the execution, increases the innate weakness of such testimony.
Due diligence was used in the prosecution of the debt to judgment, execution, forthcoming bond, and judgment and execution thereon. And after the latter execution had, it seems, been levied, we find McMul-lin still pressing for the payment of the debt, and threatening to prosecute the sheriff for his default. His interest was to get his money as soon as he could; and it does not appear that he had any motive to interfere with the execution, at least unless he could secure a greater benefit to himself by such interference. He professed a willingness to indulge the debtors, without saying how long, if they would pay him one thousand dollars in cash, provided, however, that Mr. Gilmore, whom he considered ultimately liable for the debt, would consent to such indulgence. But Mr. Gilmore refused to consent, and the thousand dollars were not paid. That amount, it seems, was sent by one of the principal debtors, Thomas, to the sheriff to be paid to McMullin, but it was wholly applied to the payment of other claims which the sheriff professed to'have against the said Thomas; the largest one of which was an execution which the said Thomas had before discharged; and to that extent at least, therefore, the money sent by him to the sheriff was, by the latter, misapplied.
*We can readily account for the long delay which has occurred in the prosecution of this claim by the creditor. The execution was levied, if at all, “together with other executions’’; and the sheriff says in his deposition, that the property thus levied on was “subject to older levies, and Mr. Thomas was hard run, and trying to get indulgence upon his debts.” There was, then, great complication and difficulty about this matter. Thomas may have been solvent, and he says he was; but evidently, his property was much encumbered. McMullin might, perhaps, have made his money at once, by having his execution levied, as he well might have done, on the property of the surety, Shannon, instead of the principal, Thomas. But he no doubt desired, if he could, to make the money of the principal; and probably thought that it would facilitate that object to get a thousand dollars of the money in cash, even if he had to give a little indulgence for the balance. But he was unwilling to make such an arrangement without the consent of Gilmore, who refused to consent. He would, no doubt, also have required the consent of the surety if Gilmore *366 had consented. But supposing such arrangement would have been for the benefit of the creditor, it would have been for the benefit of the surety also, who would, therefore, readily have agreed to it. The fact is, there is no reason to believe that the surety was not in favor of any indulgence which the creditor might choose to give for the payment of the debt. McMullin, in his answer, as we have already seen, says, that since the 25th day of August 1860, he “has several times admonished complainant Shannon that the complainant being bound with Abijah Thomas for the amount of said execution, ought, for his protection, “to secure from said Thomas an indemnity against *it; and your respondent positively avers, that at these int stances with complainant he never disputed his liability to respondent, nor was respondent ever informed of any claim of discharge from such liability, until the filing of complainant’s bill.” If this allegation had not been true it would surely have been denied by the complainant. .But he did not deny it, and gave no deposition in the case.
The war commenced shortly after the first payment of five hundréd dollars was made on account of the execution, which was on the 22d of December, 1860, and nearly a year before the second payment of five hundred dollars was made on the same account, which was on the 22d of January, 1862. In the meantime, to wit, on the 30’th of April, 1861, a stay law was passed by the convention, entitled “An ordinance to provide against the sacrifice of property, and to suspend proceedings in certain cases.” After which time, and until recently before the execution was issued, which was injoined in this case, there was a continual succession of stay laws, which prevented the collection of debts by execution, and sufficiently accounts for the delay which has occurred in this case since the commencement of the war. Interest on this debt for two years of that period, has, it seems, been collected by the creditor.
It is not pretended that the sheriff yet has the property said to have been levied on in his possession, or any part of it, or that any of it has been wasted by him. It is not pretended, and it is not probable, that any of it was ever taken by the sheriff out of the hands of the principal debtor to whom it seems to have belonged. The principal debtor does not say in his deposition that he was ever deprived of an atom of the property for a single moment. No doubt the *levy was made, if levy it could be called, by merely seeing the property; or, what is more likely, by its being merely named by the owner to the sheriff, to enable the latter to endorse a levy on the execution. Most of the property said to have been levied on consisted of slaves, which were emancipated by the effect of the war; and thus no doubt were released from the execution^ if they ever were subject to it; and the rest of the property included in the levy has no doubt long since been applied to prior executions, or otherwise disposed of by the owner. The appellant in his bill says, as we have seen, that the “property levied on is all gone, or put beyond the reach of execution by emancipation, sale, wear and tear, and deeds of trust,” &c.
But whether the sheriff has incurred any liability or not in regard to the said execution, and if so, to whom and to what extent, are questions not involved in this case; but which will arise in any proceeding that may hereafter be had against him to fix and enforce such liability.
I have thus far referred to no authorities on the subject of the rights and liabilities of sureties in such cases, and will now refer only to two cases recently decided by this court, in which the whole subject is reviewed, and all the authorities which can have any bearing on this case are referred to. These two cases are, Humphrey v. Hitt, 6 Gratt. 509; and Walker, &c. v. The Commonwealth, 18 Gratt. 13, in both of which the court was unanimous. In the former Judge Baldwin delivered the opinion; and he lays down the law so clearly and so appropriately to this case, in regard to the rights, liabilities and duties of a surety, that I cannot do better than to borrow some of his language, and hope I may be excused for so doing. “It is perfectly *well settled, and has been very properly conceded in the argument,” he said, “that a surety is not absolved by the want of diligence on the part of the creditor in regard to his demand against the principal debtor. A defense on the ground of mere laches would, indeed, be inconsistent with the relation of the parties. The obligation of a surety is not conditional, but absolute. His undertaking to pay is not in the event of the inability or unwillingness of the principal, but at all events, qnd under all circumstances, as much so as if he were himself the sole debtor. Such is the form of his obligation (unless specially qualified), whether separate or joint, and such its true intent and meaning; and it is founded upon a lawful and sufficient consideration, the credit given to the principal by his procurement. It is the duty of the surety, as well as the principal, to see to the payment of the money; and the forbearance of the creditor is a tacit indulgence given to both, in which the acquiescence of the one is equally significant with that of the other. Hence it is, that if the obligation be several, the creditor may pursue the surety only; that if it be merely joint, he may bring his action against the survivor, or the representative of the deceased, at his option, as if both were principals; that after a several' judgment against the principal, he need not sue out execution thereupon, but may sue and coerce payment from the surety; that upon a joint judgment against both, he may cause execution to be levied at his pleasure, upon the person or property of either; that he may pursue the surety personally, notwithstanding a collateral surety given by him or his principal. ” But without quoting more from this *367 opinion, X will refer to it, and the opinion in the other of the *two cases just cited, as setting- forth all the law which can have any material bearing on this case.
Upon the whole, I am of opinion that there is no error in the .decree appealed from, and that it ought to be affirmed.
The other judges concurred in the opinion of Moncure, P.
Decree affirmed.